William Lester SUFF, Appellant,

v.

The STATE of Texas, Appellee.

Teryl Rose SUFF, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 51152 and 51153.

Court of Criminal Appeals of Texas.

Jan. 21, 1976.

Rehearing Denied Feb. 11, 1976.

John L. Gamboa and Harry L. Williams, Fort Worth, for William Suff.

Kenneth Pounds (Court appointed), Hurst, for Teryl Rose Suff.

Tim Curry, Dist. Atty. and Marvin Collins, Asst. Dist. Atty., Fort Worth, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

OPINION

ODOM, Judge.

Appellants, husband and wife, were tried together upon their pleas of not guilty and convicted of the murder of their infant daughter. A jury assessed punishment at seventy years for each.

Appellant William Suff's appointed attorneys have filed a brief in which they conclude that his appeal is frivolous. He has been so informed and has exercised his right to file a pro se brief. This procedure is in accordance with *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *Gainous v. State*, Tex.Cr.App.,

436 S.W.2d 137. Appellant Teryl Suff urges one ground of error.

■ We have completely reviewed the record. In the case of William Suff the grounds of error in his pro se brief are patently without merit.[1] We have discovered no unassigned error that should be considered in the interest of justice, Art. 40.-09(13), V.A.C.C.P. The judgment as to him is affirmed.

The sole ground of error urged by appellant Teryl Suff challenges the sufficiency of the evidence to support the conviction.

The record reflects an appalling history of physical abuse of both the deceased, who was two months old at the time of her death, and her baby brother, who was then twenty-one months of age. The evidence adduced at trial pointed to the father as the actual perpetrator of the violence. There was testimony that he had abused both children frequently. There was no evidence whatsoever that the mother, Teryl Suff, had herself ever directly injured either child.

On the day of the murder, Teryl Suff awoke between 6:30 a. m. and 7:00 a. m. She arose, changed her daughter's diaper, fed her, laid her back in her crib, and prepared to go to work. Shortly after 8:00 a. m., she woke her husband William and left for work with Irene Taylor, her next-door neighbor who customarily gave her a ride to work.

William Suff was home alone with the two children that entire morning, according to his testimony, except for two brief departures to check the mailbox and to make a telephone call at a pay telephone two blocks away. The children were left unattended on each occasion. After returning from making the phone call, he testified, he discovered his daughter lying face down on the floor between her crib and the wall. She was dead. He then ran back to the pay phone and told his wife to come home immediately because "something had happened to our baby." The time was shortly before noon.

Teryl Suff ran home immediately and went into hysterics. She broke into Irene Taylor's next-door apartment and called an ambulance. Taylor, who had returned home and gone back to sleep, was awakened by Teryl Suff's screams to get an ambulance because her baby was dead.

We regard the testimony of Dr. Feliks Gwozdz, who performed the autopsy, as critical. Dr. Gwozdz testified that although the deceased had numerous pre-existing injuries, including thirteen broken ribs and a broken arm, the cause of death was a sharp blow to the abdomen with a blunt object. The blow caused the liver to rupture and resulted in massive bleeding into the abdominal cavity. He stated that because he could not determine the exact size of the rupture as originally inflicted and, therefore, the rate of internal bleeding, he could not state with certainty the exact time that the fatal blow was struck. He did say, however, that it could not have been less than thirty minutes or more than eight hours before he performed the autopsy, which was between 2:00 p. m. and 3:00 p. m. the day of the murder. The blow that caused death, therefore, was inflicted sometime after 6:00 a. m. that morning.

■ Obviously the State's case was founded upon circumstantial evidence. The

1. In the first four grounds of error he complains of a minor inconsistency in the testimony of two expert medical witnesses; of "derogatory and injurious" testimony by a State's witness; that another State's witness "bore a personal grudge" against him; and that a police officer should not have been allowed to testify that a mark on the deceased's body was a burn. None of these complaints present reversible error. The fifth ground of error claims jury misconduct, but nothing in the record supports that claim. Finally, he complains that a police officer should not have been allowed to testify at the guilt-innocence stage of trial that appellant's reputation for truth and veracity was bad. We note that appellant had testified and denied his guilt, rendering the officer's testimony admissible for impeachment purposes. Moreover, he was properly qualified during voir dire examination outside the hearing of the jury.

trial court properly instructed the jury upon the law of circumstantial evidence as well as upon the law of principals. From the foregoing recitation of the facts, we believe it apparent that the verdict as to William Suff was sufficiently supported by the evidence.[2]

The State in its brief has listed eleven items of circumstantial evidence that it contends are sufficient to support Teryl Suff's conviction:

"(1) An apartment neighbor, Irene Taylor, and co-worker of Appellant testified that she (Mrs. Taylor) bought food for both the Suff children when they first moved in (September 1973) even though the Suffs had apparently enough money to keep up two aquariums.

"(2) Appellant, who normally appeared bright and talkative to Mrs. Taylor, appeared pale, and ill the morning of September 25, 1973, the date of the offense, as Mrs. Taylor took her to work. Appellant did not invite Mrs. Taylor into the apartment as she had usually done.

"(3) Appellant and her husband (co-defendant) both testified and both denied knowledge of any prior serious physical injuries to the deceased child.

"(4) One week prior to the offense, Appellant's husband brought both Suff children to the cafe where Appellant and Mrs. Taylor worked. Mrs. Taylor testified the deceased child had a face black with bruises and a hurt arm.

"(5) Mrs. Taylor asked Appellant on this occasion (4 above) if she weren't scared to leave her children with her husband with such injuries which were 'never taken care of' but was told that her husband would never do it intentionally, but only in a fit of temper.

"(6) The medical evidence showed a broken arm and thirteen broken ribs in the process of healing, definitely establishing pre-existing injuries.

"(7) Appellant testified her daughter (deceased) vomited the night before.

"(8) Appellant testified her 21 month-old son has suffered injuries serious enough to put him in intensive care at age 3 months resulting from a cradle that rocked; she and her husband went swimming while the child was in intensive care.

"(9) Appellant testified she saw the deceased at 6:30–7:00 a. m. on September 25, 1973, when she fed her and changed her diaper.

"(10) The medical examiner's testimony that deceased could have received the fatal blow to the abdomen eight hours before his examination (2:00 p. m.) demonstrated that such blow could have been struck at 6:00 a. m, a time when Appellant was at home.

"(11) The patent untruthfulness of Appellant's testimony denying any serious previous injuries demonstrated an attempt to deceive the fact finder—a circumstance from which guilt could be inferred."

We do not doubt that this evidence as well as the entire record establish that Teryl Suff was, to understate the matter, a poor mother. But we are at a loss to understand how most of these items could be probative of her criminal liability for the particular offense charged. Evidence of the deceased's pre-existing injuries could not be evidence of Teryl Suff's guilt of the instant offense in the face of further evidence that her husband was responsible for the injuries and that none, in any event, caused death. See *Curry v. State,* Tex.Cr. App., 468 S.W.2d 455, vacated in part, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 761 (1972); *Ray v. State,* 160 Tex.Cr.R. 12, 266

---

**2.** In addition, some of his testimony was incredible. He testified, for example, that with reference to the deceased's pre-existing injuries he had never noticed anything wrong with her physical condition. Suff was a trained paramedic ambulance driver whose specialty was pediatrics. Upon cross-examination, he explained the apparent contradiction as follows: "Sir, if you pick up a child right, there could be a lot of things wrong with it and it will never hurt that child."

S.W.2d 124. Nor did she deny the existence of such injuries, contrary to the State's assertion. Other items were only evidence of the guilt of William Suff.

Only the evidence provided by Irene Taylor relating to appellant's demeanor and conduct the morning of the murder is circumstantial evidence that she committed the offense. The relevant portion of the record is as follows:

"Q. [by the prosecutor] Now directing your attention to the morning of September the twenty-fifth, Nineteen Seventy-three, I'll ask the jury—I'll ask you to tell the jury what you did after you got up and after you saw the kids off to school?

"A. [by Mrs. Taylor] I always carried Terry [Teryl] to work. She went to work three days a week at nine o'clock. I would carry her to work, because she didn't have transportation, so that morning, I went to the door and I knocked, and when she came to the door—Every morning, she had opened the door and said, 'come in,' but that morning, she just barely opened the door, and I said, 'Terry, I'm going to have to carry you to work early because I have to be at Hurst to the doctor at nine o'clock,' and she said, 'All right, I'll be ready in a minute.' I said 'Terry, are you able to go to work? You're awful pale, you're sick,' and she said, 'No, I'm all right.' I said, 'Well, hurry up. I have to be at Hurst,' so on the way to work, she is always chattering, laughing and talking, but that morning, she didn't say anything.' "

Although this evidence may have tended to show that appellant was ill or upset, it constitutes no evidence at all that she had struck a death blow to her baby, nor is there even a scintilla of evidence to that effect elsewhere in the record. See *Resendez v. State,* Tex.Cr.App., 495 S.W.2d 934; *Calloway v. State,* Tex.Cr.App., 235 S.W.2d 900; cf. *Wood v. State,* Tex.Cr.App., 515 S.W.2d 300; *Creel v. State,* Tex.Cr.App., 493 S.W.2d 814; *Hall v. State,* Tex.Cr.App., 488 S.W.2d 94; *Curry v. State,* supra;

*McClure v. State,* Tex.Cr.App., 430 S.W.2d 813; *Glass v. State,* Tex.Cr.App., 402 S.W.2d 173; *King v. State,* Tex.Cr.App., 396 S.W.2d 409; *Smith v. State,* 160 Tex.Cr.R. 227, 268 S.W.2d 144; *Ray v. State,* supra.

There remains the question whether this evidence could reasonably have been interpreted by the jury as showing participation in the event sufficient to render her guilty as a principal to the offense.

In *Robinson v. State,* Tex.Cr.App., 493 S.W.2d 780, 782, this Court stated:

"To be guilty of a felony offense as a principal, a defendant must be actually present at the time of its commission or if not present at the time of the commission of the offense he must at the time the act is being done, be himself actively engaged in the furtherance of the common purpose and design at some other place."

The record is silent as to any common purpose or design. As to those situations in which one may be guilty as a principal when actually present, the very least that is required is, in addition to physical presence, encouragement by words or agreement to the commission of the offense. Such agreement must be prior to or contemporaneous with the criminal event. *Middleton v. State,* 86 Tex.Cr.R. 307, 217 S.W. 1046, 1052–53; Arts. 65–69, V.A.P.C. (cf. V.T.C.A. Penal Code Secs. 7.01 and 7.02).

The only evidence in the record that appellant encouraged or agreed with the act of murder is that given by Irene Taylor relating to her conduct and demeanor the morning of the offense. Such evidence, however, is wholly consistent with many other sequences of events that would not constitute her a principal.

Thus, every reasonable hypothesis except the guilt of appellant has not been excluded by the evidence. *Davis v. State,* Tex.Cr.App., 516 S.W.2d 157; cf. *Stokes v. State,* Tex.Cr.App., 506 S.W.2d 860; *Lombardo v. State,* Tex.Cr.App., 503 S.W.2d 780. To say that she performed acts sufficient to render her guilty of the offense of murder,

either as a primary actor or as a principal, would be to engage in mere speculation. To uphold the jury's verdict under these facts would endorse such speculation. We cannot bring ourselves, in spite of the gravity of the offense and the revulsion with which it fills us, to uphold a verdict supported only by innuendo bolstered by moral outrage. The judgment of conviction as to Teryl Suff must be reversed because the evidence is insufficient to support the same.

In No. 51,152 (William Lester Suff) the judgment is affirmed.

In No. 51,153 (Teryl Rose Suff) the judgment is reversed and the cause remanded.